UNITED STATES DISTRICT COURT
FILED
MAY - 3 2021
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF NEW YORK

—————————————————————— )
IN THE MATTER OF                           )
THE EXTRADITION OF                         )        21-MJ-5077
AYELE LOGAN RUSSELL                        )
—————————————————————— )

## EXTRADITION COMPLAINT PURSUANT TO 18 U.S.C § 3184

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1.     In this matter, I represent the United States in fulfilling its treaty obligations to Jamaica.

2.     There is an extradition treaty in force between the United States and Jamaica. *See* Extradition Treaty Between the Government of the United States of America and the Government of Jamaica, U.S.-Jam., June 14, 1983, S. TREATY DOC. NO. 98-18 (the "Treaty").

3.     Pursuant to the Treaty, the Government of Jamaica has submitted a formal request through diplomatic channels for the extradition of Ayele Logan Russell ("Russell" or the "fugitive").

4.     According to information the Government of Jamaica has provided, Russell was charged with murder, contrary to Jamaican common law.

5.     This offense was committed within the jurisdiction of Jamaica.  On June 9, 2017, Hubert Williams, Justice of the Peace for the Parish of Westmoreland, Jamaica, issued a warrant for Russell's arrest.  According to Jamaica, Russell killed his girlfriend, N.D., and hid N.D.'s dead body in a concrete structure in Russell's room.  Russell lived with his mother,

Marvella Johnson ("Johnson").   Johnson later permitted investigators to search Russell's room, where they found and opened the concrete structure and found N.D.'s corpse, which showed stab wounds to her abdomen and arm.  A more detailed summary appears below:

a.　　　On June 5, 2017, N.D.'s mother, Carlene Baily ("Baily"), reported to police that N.D. was missing and that Baily suspected that Russell, N.D.'s boyfriend, had killed her.  Baily also told police that she last had contact with N.D. on April 23, 2017, when N.D. told Bailey via Facebook that N.D. intended to spend her birthday, April 29, 2017, at a hotel in Negril, Jamaica.  Bailey stated that Russell lived with Johnson in Negril.

b.　　　Police then contacted Johnson, who told them that Russell was overseas.  Johnson also gave police consent to access Russell's room within her house.

c.　　　When police arrived at Johnson's home, they observed that Russell's room was padlocked and secured with a long chain attached to weights.  Johnson used a hammer to knock away the padlocks and allowed police to access Russell's room. Upon entering the room, police smelled a foul odor and saw a concrete structure behind a mattress and under a pile of clothing.  Johnson told police that the concrete structure had not previously been in Russell's room and that Russell must have been the person who built it. Within the room, police also observed a machete, a blood-stained knife, blood on various items, two construction buckets, concrete on the bedroom floor, and a Western Union receipt showing Russell's name.

d.　　　Police drilled into the concrete structure and saw black plastic bags within.  Inside the black plastic bags were sheets, and within the sheets was the decomposing body of an adult woman.  Police could see that the woman's corpse had

2

stab wounds to the abdomen and right arm.

e.    During a subsequent autopsy, a forensic pathologist could not form a definite opinion as to the cause of death (because of the state of the corpse's decomposition), but he attributed the woman's death to the stab wound to the abdomen.  During the autopsy, N.D.'s uncle identified the corpse as N.D., including by reference to a tattoo on her chest.

f.    Police interviewed Johnson, who reported that:  (i) Russell was the only person with access to the room and was in sole possession of the key; (ii) Russell had lived in the room with N.D. and her daughter since they moved in with him sometime in 2016; (iii) on April 16, 2017, she witnessed Russell and N.D. fighting and that, when Johnson told Russell to behave himself, he told Johnson that he would "burst a shot into [Johnson's] head"; (iv) on April 18 & 19, 2017, she smelled a strong odor of disinfectant coming from Russell's room; (v) on April 23, 2017, she saw Russell place a suitcase in the trunk of a car in front of her house; he told her that he would return soon, but she did not see him again after that conversation, and she saw that the door to his room had been padlocked and chained; and (vi) five days later, she received a text message from Russell stating that he was in New York.

g.    Jamaican immigration records show that Russell departed Jamaica on April 27, 2017, for New York.

6.    Russell may be found within the jurisdiction of this Court at Elmira Correctional Facility in Elmira, New York, which is located within the Western District of New York.

7.    Mariano H. Banos, an attorney in the Office of the Legal Adviser of the U.S.

Department of State, has provided the U.S. Department of Justice with a declaration (i) authenticating a copy of the diplomatic note by which the request for extradition was made and a copy of the Treaty; (ii) stating that the Treaty covers the offense for which Jamaica requests extradition; and (iii) confirming that the documents supporting the request for extradition are properly certified by the principal U.S. diplomatic or consular officer in Jamaica, in accordance with 18 U.S.C. § 3190, so as to enable them to be received into evidence.

8.      The declaration from the U.S. Department of State with its attachments—including copies of the diplomatic note from Jamaica, the Treaty, and the certified documents submitted in support of the request—are attached as Exhibit 1 to this complaint and are incorporated by reference herein.

WHEREFORE, the undersigned requests that a warrant for the arrest of the aforenamed person, Ayele Logan Russell, be issued in accordance with 18 U.S.C. § 3184 and the Treaty, so that the fugitive, Ayele Logan Russell, may be arrested and brought before this Court to the end that the evidence of criminality may be heard and considered.

CHARLES M. KRULY
Assistant United States Attorney

Sworn to before me telephonically and subscribed

this 3rd day of May, 2021, at Buffalo, New York.

HON. MICHAEL J. ROEMER
United States Magistrate Judge

4

# EXHIBIT 1

<u>DECLARATION OF MARIANO H. BAÑOS</u>

I, Mariano H. Baños, declare and say as follows:

1. I am an Attorney-Adviser in the Office of the Legal Advisor, Department of State, Washington, D.C.  This office has responsibility for extradition requests within the Department of State, and I am charged with the extradition case of Ayele Logan Russell. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and Jamaica are found in the Extradition Treaty between the United States of America and Government of Jamaica signed on June 14, 1983, and entered into force July 7, 1991 (the "Treaty"). A copy of the Treaty is attached to this declaration.

3. In accordance with the provisions of the Treaty, the Jamaican Embassy has submitted a Diplomatic Note dated January 19, 2018, formally requesting the extradition of Ayele Logan Russell.  A copy of the Diplomatic Note is attached to this declaration.

4. In accordance with Article XVII of the Treaty, the Government of the United States provides legal representation in its courts for the Government of Jamaica in its extradition requests, and the Government of Jamaica provides legal representation in its courts for extradition requests made by the United States.

5. The offence for which extradition is sought is an extraditable offense pursuant to Article 2 of the Treaty.

6. The documents submitted by the Government of Jamaica in support of its extradition request were certified by Eric Khant, Charge d'Affaires of the United States Embassy in Kingston, in accordance with Title 18, United States Code, Section 3190. Due to an administrative error, there were two dates listed on the certificate, May 15,

-2-

2018 and May 16, 2018. This minor discrepancy does not affect the validity of the certification. Mr. Khant, at the time of his certification, was the principal diplomatic officer of the United States in Jamaica.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in Washington, District of Colombia on September 9th, 2020.

MARIANO H. BAÑOS

Attachments:

1. Copy of Note
2. Copy of Treaty

EXT_RUSSELL_00002



*EMBASSY of JAMAICA*
*WASHINGTON*

L/LEI

2018 JAN 19 P 4: 01

DEPARTMENT OF STATE

Ref.

The Embassy of Jamaica presents its compliments to the US Department of State and has the honour to request the formal extradition of **AYELE LOGAN RUSSELL** pursuant to the Extradition Treaty between the Government of Jamaica and the Government of the United States of America, signed on the 14th June 1983 and entered into force on the 7th July 1991.

The Embassy further has the honour to submit one certified original and two copies of authenticated documents in support of the extradition of AYELE LOGAN RUSSELL.

AYELE LOGAN RUSSELL is wanted to stand trial in Jamaica for the offence of Murder contrary to common law.

The warrant that AYELE LOGAN RUSSELL committed the following offence:

*Murder*
"Between the 23rd day of April, 2017 and the 27th Day of April, 2017 in the parish of Westmoreland murdered N████ D██████ S█████ D██contrary to common law."

The Government of Jamaica is requesting the extradition of AYELE LOGAN RUSSELL for the offence of Murder, only.

The charges against AYELE LOGAN RUSSELL are punishable under the laws of Jamaica by a period of imprisonment of more than one year and are covered under Article II of the Treaty between Jamaica and the United States of America.

-2-

In addition, Jamaica has no statute of limitations and thus there is no bar to the prosecution of AYELE LOGAN RUSSELL for the offence for which extradition is required.

AYELE LOGAN RUSSELL is a citizen of Jamaica, born on the 19th day of August, 1995 in Jamaica. AYELE LOGAN RUSSELL is described as being approximately 5ft 8in tall, he has narrow face and straight nose, black hair usually worn in cornrows and the tattoo of a bird on his chest.

A photograph of AYELE LOGAN RUSSELL is contained in the authenticated documents.

AYELE LOGAN RUSSELL is believed to be within the borders of the United States of America. Information provided by the Passport Immigration and Citizen Agency (PICA) of Jamaica shows that AYELE LOGAN RUSSELL departed Jamaica on the 27th day of April, 2017 from the Donald Sangster International Airport at Montego Bay for New York in the United States of America.

His Jamaican passport number is A3609438 which expires on the 15th day of April, 2024.

The Government of Jamaica also requests the seizure of all articles, instruments, objects of value, documents or other evidence relating to the offence for surrender with the fugitive, if extradition to Jamaica is granted. Seizure and surrender of property is authorised by Article XVI of the Treaty.

The Embassy of Jamaica avails itself of this opportunity to renew to the United States Department of State the assurances of its highest consideration.

Office of the Chief of Protocol
Department of State
Washington, DC

**19th January 2018**

1 of 100 DOCUMENTS

U.S. Treaties on LEXIS

JAMAICA

EXTRADITION TREATY WITH JAMAICA

TREATY DOC. 98-18

*1983 U.S.T. LEXIS 419*

June 14, 1983, Date-Signed

**STATUS:**
[*1]   PENDING: April 24, 1984. Treaty was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

MESSAGE FROM THE PRESIDENT OF THE UNITED STATES

TRANSMITTING THE EXTRADITION TREATY BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF JAMAICA, SIGNED AT KINGSTON ON JUNE 14, 1983

**TEXT:**
98TH CONGRESS

*2d Session*

SENATE

**LETTER OF TRANSMITTAL**

THE WHITE HOUSE, *April 17, 1984.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Treaty on Extradition between the United States of America and Jamaica, signed at Kingston on June 14, 1983.

I transmit also, for the information of the Senate, the report of the Department of State with respect to the Treaty.

The Treaty is the first modern United States extradition treaty within the Caribbean region. The Treaty will facilitate United States efforts to prosecute narcotics conspiracies by expressly providing that conspiracies and attempts to commit extraditable offenses constitute extraditable offenses.

The Treaty follows generally [*2]   the form and consent of extradition treaties recently concluded by this Government. Upon entry into force of this Treaty, the Extradition Treaty between the United States and the United Kingdom signed on December 22, 1931, shall cease to have effect between the United States and Jamaica.

This Treaty will make a significant contribution to international co-operation in law enforcement. I recommend that the Senate give early and favorable consideration to the Treaty and give its advice and consent to ratification.

RONALD REAGAN.

**LETTER OF SUBMITTAL**

DEPARTMENT OF STATE,

1983 U.S.T. LEXIS 419, *

*Washington, April 5, 1984.*

THE PRESIDENT, *The White House.*

THE PRESIDENT: I have the honor to submit to you the Treaty on Extradition between the United States of America and Jamaica, signed at Kingston on June 14, 1983. I recommend that the Treaty be transmitted to the Senate for advice and consent to ratification.

The Treaty is the first modern United States extradition treaty within the Caribbean region. It will supersede the United States-United Kingdom Treaty on Extradition of 1931 which was made applicable to Jamaica in 1935. The Treaty follows generally the form and content of extradition treaties [*3]   recently concluded by this Government.

Article 1 obligates each State to extradite to the other, in accordance with the terms of the Treaty, any persons charged with or convicted of an extraditable offense by the requesting State. (Extradition shall also be granted, Article 2 explains, for attempts and conspiracies to commit extraditable offenses, as well as for aiding and abetting the commission of such offenses.)

Article 1 further states that extradition shall be granted when the offense for which extradition is requested was committed outside the requesting State provided there is jurisdiction under the laws of both States for the punishment of such an offense in corresponding circumstances.

Article 2 permits extradition for any offense punishable under the laws of both States by imprisonment for more than one year. Instead of listing each offense for which extradition may be granted, as was United States practice until recently, this Treaty adopts the modern practice of permitting extradition for any crime punishable under the laws of both contracting Parties for a minimum period. This obviates the need to renegotiate or supplement the Treaty should both States pass laws covering [*4]   new types of criminal activity, such as computer-related crimes.

Article 2 also follows the practice of recent United States extradition treaties in indicating that the dual criminality standard should be interpreted liberally in order to effectuate the intent of the Parties that fugitives be brought to justice.

Articles 3 and 6 state mandatory grounds for refusal of extradition. Article 3 provides that extradition shall be denied when the offense for which extradition is sought is a political offense or when it is established that the request is in fact made for the purpose of prosecuting the person sought on account of race, religion, nationality or political opinions or when, for the same reasons, the person sought is likely to be denied a fair trial or punished, detained or restricted in his personal liberty. Article 6 provides that extradition shall be denied where the requesting State's statute of limitation bars prosecution or enforcement of the penalty.

Article 4 states that extradition shall not be precluded by the fact that the requested State has chosen not to prosecute the person sought for the acts for which extradition is requested or has discontinued any pending criminal [*5]   proceedings.

Articles 3(5) and 5 state discretionary grounds for refusal of extradition. Article 3(5) provides that extradition may be denied for military offenses. Article 5 provides that extradition may be refused when the offense is punishable by death in the requesting, but not the requested, State, unless satisfactory assurances are received that the death penalty, if imposed, will not be carried out.

Article 7 states the obligation of the requested State concerning extradition of its nationals. It provides, in brief, that if extradition is denied on the basis of nationality, the requested State shall, if it has jurisdiction, submit the case to its authorities for prosecution. Extradition shall not be refused, however, if the person sought is a national of both States.

Articles 8-11 specify procedures by which extradition is to be accomplished. The procedures therein are similar to those found in other modern United States extradition treaties.

Article 12 provides that surrender shall be deferred when the person whose extradition is sought is being proceeded against or has been convicted of a different offense in the requested State, unless the laws of the requested State otherwise [*6]   provide.

Article 13 states that the executive authority of the requested Party shall determine to which country to surrender a person sought by more than one State.

Article 14 expressly incorporates into the Treaty the rule of specialty. This article provides, subject to specified exceptions, that a person extradited under the Treaty may not be detained, tried or punished for an offense other than that for which extradition has been granted.

Article 15 permits surrender without formal proceedings where the person sought agrees in writing to surrender after having been advised by a competent judicial authority of his or her right to a formal proceeding.

Article 16 provides that all property relating to the offense for which extradition is requested may, to the extent permitted under the laws of the requested State, be seized and surrendered to the requesting State. This provision is subject to the rights of third parties.

Article 17 governs expenses in a manner similar to other recent United States extradition treaties. This article further provides that the requested State shall represent the requesting State in any proceeding in the requested State arising out of a request for extradition.  [*7]

Article 18, like the parallel provision of almost all recent United States extradition treaties, stipulates that the Treaty is retroactive in the sense that it applies to offenses committed before as well as after its entry into force, provided that the offenses were proscribed by the laws of both States when committed.

Article 19 provides that the Treaty will enter into force thirty days after the exchange of the instruments of ratification.

Article 20 provides for termination of the Treaty by either Party upon six months written notice to the other.

The Department of Justice joins the Department of State in favoring approval of this Treaty by the Senate at an early date.

Respectfully submitted,

GEORGE P. SHULTZ.

EXTRADITION TREATY BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF JAMAICA

The Government of the United States of America and the Government of Jamaica,

Recalling the Treaty for the Mutual Extradition of Criminals between the United Kingdom and the United States of America concluded in London in 1931;

Noting that both the Government of the United States of America and the Government of Jamaica have continued to apply the terms of that Treaty;  [*8]  and

Desiring to provide for more effective cooperation between the two States in the suppression of crime and, for that purpose, to conclude a new treaty for the extradition of offenders;

Have agreed as follows:

ARTICLE I

*Obligation to Extradite*

(1) The Contracting Parties agree to extradite to each other, subject to the provisions of this Treaty:

(a) persons whom the competent authorities in the Requesting State have charged with an extraditable offense committed within its territory; or

(b) persons who have been convicted in the Requesting State of such an offence and are unlawfully at large.

(2) With respect to an offence committed outside the territory of the Requesting State, the Requested State shall grant extradition, subject to the provisions of this Treaty, if there is jurisdiction under the laws of both States for the punishment of such an offense in corresponding circumstances.

ARTICLE II

*Extraditable Offences*

1983 U.S.T. LEXIS 419, *

(1) An offence shall be an extraditable offence if it is punishable under the laws of both Contracting Parties by imprisonment or other form of detention for a period of more than one year or by any greater punishment.

(2) The following offences shall   [*9]   be extraditable if they meet the requirements of paragraph (1):

> (a) conspiring in, attempting to commit, aiding or abetting, assisting, counselling or procuring the commission of, or being an accessory before or after the fact to, an offence described in that paragraph; or

> (b) impeding the apprehension or prosecution of a person charged with an offence described in that paragraph.

(3) For the purposes of this Article, an offence shall be an extraditable offence:

> (a) whether or not the laws of the Contracting Parties place the offence within the same category of offences or denominate the offence by the same terminology; or

> (b) whether or not the offence is one for which United States federal law requires proof of interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court.

ARTICLE III

*Political and Military Offences*

(1) Extradition shall not be granted if the offence for which extradition is requested is of a political character.

(2) Extradition shall also not be granted if:

> (a) it is established that extradition is [*10]   requested for political purposes; or

> (b) it is established that the request for extradition, though purporting to be on account of the extraditable offence, is in fact made for the purpose of prosecuting or punishing the person sought on account of his race, religion, nationality, or political opinions; or

> (c) the person sought is by reason of his race, religion, nationality, or political opinions, likely to be denied a fair trial or punished, detained or restricted in his personal liberty for such reasons.

(3) It shall be the responsibility of the competent authorities of the Requested State to decide any question arising under paragraph (1). However, it shall be the responsibility of the executive authority of the Requested State to decide any question arising under paragraph (2) or (5) except to the extent that the national laws of that State expressly grant such powers to its courts.

(4) Paragraphs (1) and (2) shall not apply to an offence which is extraditable pursuant to a treaty or convention to which both Contracting Parties are parties, the purpose of which is to prevent or repress a specific category of offences, and which imposes on States an obligation either to extradite [*11]   the person sought or submit the matter to the competent authorities for decision as to prosecution.

(5) Extradition may be refused for offences under military law which are not offences under ordinary criminal law.

ARTICLE IV

*Effect of Decision Not to Prosecute*

Extradition shall not be precluded by the fact that the competent authorities in the Requested State have decided not to prosecute the person sought for the acts for which extradition is requested or have decided to discontinue any criminal proceedings which have been initiated against the person sought.

ARTICLE V

*Capital Punishment*

(1) When the offence for which extradition is requested is punishable by death under the laws of the Requesting State, and the laws of the Requested State do not permit such punishment for that offence, the executive authority of the Requested State may refuse to grant extradition.

(2) In exercising its discretion pursuant to paragraph (1), the executive authority of the Requested State shall give due and sympathetic consideration to any assurance given by the Requesting State, insofar as the laws of the Requesting State permit, that the death penalty will not be carried out.

ARTICLE VI [*12]

*Lapse of Time*

Extradition shall not be granted when prosecution of the offence for which extradition has been sought, or enforcement of the penalty for such an offence, has become barred by lapse of time according to the laws in the Requesting State.

ARTICLE VII

*Nationality*

(1) Neither Contracting Party shall be bound to deliver up its own nationals but the executive authority of the Requested State shall, if not prevented by the laws of that State, have the power to deliver them up if, in its discretion, it be deemed proper to do so.

(2) Extradition shall not be refused on the ground that the fugitive is a national of the Requested State if the fugitive is also a national of the Requesting State.

(3) If extradition is not granted for an offence pursuant to paragraph (1), the Requested State shall, if it has jurisdiction over the offence, submit the case to its highest competent authorities for decision as to prosecution, in according with the law of that State.

ARTICLE VIII

*Extradition Procedures and Required Documents*

(1) The request for extradition shall be made through the diplomatic channel.

(2) The request for extradition shall be supported by:

(a) documents, statements,   [*13]   or other evidence which describe the identity and probable location of the person sought;

(b) a statement of the facts of the case, including, if possible, the time and location of the offence;

(c) a statement of the provisions of the law describing the essential elements and the designation of the offence for which extradition is requested;

(d) a statement of the provisions of the law prescribing the punishment for the offence; and

(e) a statement of the provisions of the law prescribing any time limit on the prosecution or the execution of punishment for the offence.

(3) A request for extradition relating to a person who is sought for prosecution shall also be supported by:

(a) a copy of the warrant of arrest issued by a judge or other judicial authority in the Requesting State; and

(b) such evidence as would justify the committal for trial of that person if the offence had been committed in the Requested State.

(4) When the request for extradition relates to a convicted person, in addition to those items required by paragraph (2), it shall be supported by a certificate of conviction or copy of the judgment of conviction rendered by a court in the Requesting State. If the   [*14]   person has been convicted and sentenced, the request for extradition shall also be supported by a statement showing to what extent the sentence has been carried out. If the person has been convicted but not sentenced, the request for extradition shall also be supported by a statement to that effect.

(5) Statements, depositions and other documents transmitted in support of the request for extradition shall be transmitted through the diplomatic channel and shall be admissible if certified or authenticated in such manner as may be required by the law of the Requested State.

ARTICLE IX

*Additional Information*

(1) If the executive authority of the Requested State considers that the information furnished in support of the request for extradition is not sufficient to fulfill the requirements of this Treaty, it shall notify the Requesting State in order to enable that State to furnish additional information before the request is submitted to a court of the Requested State.

(2) The executive authority may fix a time limit for such information to be furnished.

(3) Nothing in paragraph (1) or (2) shall prevent the executive authority of the requested State from presenting to a court of that [*15]   State information sought or obtained after submission of the request to the court or after expiration of the time stipulated pursuant to paragraph (2).

ARTICLE X

*Provisional Arrest*

(1) In case of urgency either Contracting Party may request the provisional arrest in accordance with the law of the Requested State of any accused or convicted person pending the request for extradition. Application for provisional arrest shall be made through the diplomatic channel or directly between the Department of Justice in the United States of America and the Minister responsible for extradition in Jamaica.

(2) The application shall contain:

(a) a description of the person sought;

(b) the location of that person if known;

(c) such information as would be necessary to justify the issuance of a warrant of arrest had the offence been committed, or the person sought been convicted, in the territory of the Requested State; and

(d) a statement that a request for extradition of the person sought will follow.

(3) On receipt of such an application, the Requested State shall take the appropriate steps to secure the arrest of the person sought. The Requesting State shall be promptly notified of the [*16]   result of its application.

(4) A person who is provisionally arrested shall be discharged from custody upon the expiration of sixty (60) days from the date of arrest pursuant to the application for provisional arrest if the executive authority of the Requested State has not received the formal request for extradition and the supporting documents required by Article VIII.

(5) The fact that a person is discharged from custody pursuant to paragraph (4) shall not prejudice the extradition of that person if the extradition request and the supporting documents mentioned in Article VIII are delivered at a later date.

ARTICLE XI

*Decision and Surrender*

(1) The Requested State shall promptly communicate through the diplomatic channel to the Requesting State its decision on the request for extradition.

(2) If the request for extradition is denied by reason of any statutory or treaty prohibition against extradition, the Requested State shall provide such information as may be available as to the reason for the denial.

(3) If the extradition is granted, the competent authorities of the Contracting Parties shall agree on the time and place of the surrender of the person sought.

(4) If the person [*17]   sought is not removed from the territory of the Requested State within the time prescribed by the law of that State, that person may be discharged from custody and the Requested State may subsequently refuse extradition for the same offence.

ARTICLE XII

*Deferred Surrender*

1983 U.S.T. LEXIS 419, *

If the extradition request is granted in the case of a person who is being prosecuted or is serving a sentence in the territory of the Requested State for a different offence, the Requested State shall, unless its laws otherwise provide, defer the surrender of the person sought until the conclusion of the proceedings against that person or the full execution of any punishment that may be or may have been imposed.

ARTICLE XIII

*Requests for Extradition Made by Several States*

The executive authority of the Requested State, upon receiving requests from the other Contracting Party and from any other State or States for the extradition of the same person, either for the same offence or for different offences, shall determine to which State it will extradite that person.

ARTICLE XIV

*Rule of Speciality*

(1) A person extradited under this Treaty may only be detained, tried or punished in the Requesting State for [*18] the offence for which extradition is granted, or--

(a) for a lesser offence proved by the facts before the court of committal, or in the case of extradition pursuant to Article XV, any lesser offence disclosed by the facts upon which the request is based; or

(b) for an offence committed after the extradition; or

(c) for an offence in respect of which the executive authority of the Requested State, in accordance with its laws, consents to the person's detention, trial or punishment; and for the purposes of this sub-paragraph the Requested State may require the submission of documents mentioned in Article VIII or the written views of the extradited person with respect to the offence concerned, or both; or

(d) if the person--

(i) having left the territory of the Requesting State after his extradition, voluntarily returns to it; or

(ii) being free to leave the territory of the Requesting State after his extradition, does not so leave within forty-five (45) days after the first day on which he was free to do so.

(2) A person extradited under this Treaty may not be extradited to a third State unless--

(a) the Requested State consents; or

(b) the circumstances are such that he   [*19]   could have been dealt with in the Requesting State pursuant to sub-paragraph (d) of paragraph (1).

ARTICLE XV

*Simplified Extradition*

If the person sought agrees in writing to extradition after personally being advised by a judge or competent magistrate of his right to further extradition proceedings, the Requested State may grant extradition without formal proceedings. Extradition pursuant to this Article shall be subject to Article XIV.

ARTICLE XVI

*Seizure and Surrender of Property*

(1) To the extent permitted under the laws in the Requested State all articles, instruments, objects of value, documents or other evidence relating to the offence may be seized and such items may be surrendered upon the granting of the extradition. The items mentioned in this Article may be surrendered even when extradition cannot be effected due to the death, disappearance, or escape of the person sought.

(2) The rights of third parties in such property shall be duly respected.

(3) The Requested State may impose conditions designed to ensure that the rights of third parties are protected and that the property is returned to the Requested State as soon as practicable.

ARTICLE XVII

*Expenses and* [*20] *Representation*

(1) Expenses related to the transportation of the person sought to the Requesting State shall be paid by that State. All other expenses relating to the apprehension of the person sought and to subsequent proceedings shall be borne by the Requested State. However, expenses which, in the opinion of the Parties, constitute special expenditures shall be borne by the Requesting State.

(2) The Requested State shall also provide for the representation of the Requesting State in any proceedings arising in the Requested State out of a request for extradition.

(3) No pecuniary claim arising out of the arrest, detention, examination and surrender of the person sought under the terms of this Treaty shall be made by the Requested State against the Requesting State.

(4) Paragraph (3) shall not apply to claims arising out of failure of the Requesting State to comply with conditions imposed pursuant to paragraph (3) of Article XVI.

ARTICLE XVIII

*Scope of Application*

This Treaty shall apply to offences encompassed by Article II committed before as well as after the date this Treaty enters into force if at the time of the act or omission comprising the offence such act or omission [*21] constituted an offence under the laws of both States.

ARTICLE XIX

*Ratification and Entry Into Force*

(1) This Treaty shall be subject to ratification; the instruments of ratification shall be exchanged at Washington as soon as possible.

(2) This Treaty shall enter into force thirty (30) days after the exchange of the instruments of ratification.

(3) Upon entry into force of this Treaty, the Extradition Treaty between the United States of America and the United Kingdom signed at London, December 22, 1931, shall cease to have effect between the United States of America and Jamaica. Nevertheless, the 1931 Treaty shall continue to have effect in relation to any request for extradition made before this Treaty enters into force.

ARTICLE XX

*Termination*

(1) Either Contracting Party may terminate this Treaty at any time by giving written notice to the other Party, and the termination shall be effective six (6) months after the date of receipt of such notice.

(2) Nothing in paragraph (1) shall affect any request for extradition made before the date on which the termination becomes effective.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have [*22] signed this Treaty.

DONE AT KINGSTON, in duplicate, this 14th day of June, 1983.

For the Government of the United States of America
Ambassador of the United States of America

For the Government of Jamaica
Minister of National Security and Justice

**Certificate to be Attached to Documentary Evidence Accompanying**

**Requisitions in the United States for Extradition**

---

AMERICAN FOREIGN SERVICE

**U.S. Embassy, Kingston, Jamaica, May 15, 2018**

I, Eric Khant, **Charge d 'Affaires**, of the United States of America at the U.S. Embassy, Kingston, Jamaica, hereby certify that the annexed additional affidavit of support, being documentary evidence proposed to be used upon an application for the extradition from the United States of **Ayele Logan Russell** charged with the crime of murder against N█████D██████S██████D██ a Jamaican citizen contrary to common law in **Negril, Jamaica**, is properly and legally authenticated so as to entitle it to be received in evidence for similar purposes by the tribunals of Jamaica, as required by the Act of Congress of August 3, 1882.

In witness whereof I hereunto sign my name and cause my seal of office to be affixed this 16th day of May 2018.

_____
Eric Khant
Charge d 'Affaires



## Ministry of Foreign Affairs and Foreign Trade

*To All And Singular To Whom These Presents Shall Come, Greetings!*

ertify that the documents hereunto annexed are under the Seal of the Ministry of Justice

Jamaica and are in support of the request for the surrender of Ayele Logan Russell, and

such Seal is entitled to full faith and credit.

*This Certificate is not valid if it is removed or altered in any way whatsoever.*

In testimony whereof, I, Kamina Johnson Smith, Minister of Foreign Affairs and Foreign Trade of Jamaica, have hereunto caused the Seal of the Ministry of Foreign Affairs and Foreign Trade to be affixed at the City of Kingston,   this   16th   day of   January   2018.

**KAMINA JOHNSON SMITH**
Minister of Foreign Affairs and Foreign Trade



## CERTIFICATE OF AUTHENTICATION

### IN THE MATTER OF AN APPLICATION
### FOR THE EXTRADITION OF AYELE LOGAN RUSSELL
### FROM THE UNITED STATES OF AMERICA

**I, DELROY H. CHUCK, Q.C. MINISTER OF JUSTICE** for Jamaica do hereby certify:

That the affidavit of **JEREMY C. TAYLOR** is the original document which sets out the facts of the case, describes the identity of the person sought, states the provisions of the law describing the essential elements and the designation of the offence for which extradition is required and the prescribed punishment and a statement of the provisions of the law stating that there is no time limit on the prosecution or execution of punishment for the offence, pursuant to the provisions of Article VIII of  the Treaty between the Governments of Jamaica and the United States of America.

That the signature of **JEREMY C. TAYLOR** on the annexed original affidavit  is the signature of **JEREMY C TAYLOR** being a Senior Deputy Director of Public Prosecutions for the Island of Jamaica who having been appointed to that office is duly authorised by law to swear affidavits for these purposes.

**DATED THIS  3ʳᵈ  DAY OF    JANUARY      , 2018**



-------------------------------------------
**Delroy H. Chuck Q.C.**
**MINISTER OF JUSTICE**



## CERTIFICATE OF AUTHENTICATION

### IN THE MATTER OF AN APPLICATION
### FOR THE EXTRADITION OF AYELE LOGAL RUSSELL
### FROM THE UNITED STATES OF AMERICA

**I, DELROY H. CHUCK, Q.C., MINISTER OF JUSTICE** for Jamaica do hereby certify:

That the signature **CHRISTINA PORTER** on the annexed documents is the signature of **CHRISTINA PORTER** being a Clerk of the Court for the parishes of Kingston and St. Andrew within the jurisdiction of the Island of Jamaica who having been appointed to that office is duly authorised by law to administer oaths, take affidavits and certify documents for these purposes.

**AND THAT** the signature of **HUBERT WILLIAMS** on the annexed Warrant of Arrest and Information is that of **HUBERT WILLIAMS**, a Justice of the Peace in and for the parish of Westmoreland, within the jurisdiction of the Island of Jamaica who having been appointed to that office is duly authorised by law to administer oaths, take affidavits and certify documents for these purposes.

**AND THAT** the signature of **JULIET WOOLERY** on the annexed Warrant of Arrest and Information as certifying it to be true copies of the original warrant information is that of **JULIET WOOLERY**, a Justice of the Peace in and for the parish of Westmoreland, within the jurisdiction of the Island of Jamaica who having been appointed to that office is duly authorised by law to administer oaths, take affidavits and certify documents for these purposes.

**DATED THIS** 13th **DAY OF** December , 2017.



......................................................
**Delroy H. Chuck, Q.C.**
**MINISTER OF JUSTICE**

EXT_RUSSELL_00016



COPY.

**AFFIDAVIT OF JEREMY C. TAYLOR**
**IN SUPPORT OF THE REQUEST FOR**
<u>**THE EXTRADITION OF AYELE LOGAN RUSSELL**</u>

IN THE MATTER OF THE
EXTRADITION ACT 1991

AND

IN THE MATTER OF THE
EXTRADITION
TREATY BETWEEN THE
GOVERNMENTS
OF JAMAICA AND THE UNITED
STATES OF AMERICA

**I JEREMY CHRISTOPHER TAYLOR**, being duly sworn make oath and say as follows:-

[1]     That for the purpose of this Affidavit, my true place of abode and postal address is in care of the Office of the Director of Public Prosecutions, Public Building West, King Street, in the parish of Kingston

[2]     That I at present hold the position of Senior Deputy Director of Public Prosecutions.

[3]     That I graduated and obtained from the University of the West Indies on or about July 1, 1997 with a Bachelor of Laws (LLB) degree.

[4]     That I graduated and obtained from the Norman Manley Law School on or about September 3, 1999, with a Certificate of Legal Education.

[5]     That on or about November 25, 1999, I was admitted to practise as an Attorney-at-Law in the island of Jamaica.

[6]     That from October 6, 1999 to November 30, 2004, I was employed by the Government of Jamaica as a Prosecuting Counsel, namely as a Clerk of the Courts in the St. Catherine Resident Magistrates Court.

[7]     That from December 1, 2004 to present, I have been employed the Government of Jamaica, as a Prosecuting Counsel at the Office of the Director of Public Prosecutions. Since October 1, 2013 I have been the Senior Deputy Director of Public Prosecutions.

[8]     That my duties are to prosecute persons charged with criminal violations of the laws of Jamaica. As a Senior Deputy Director of Public Prosecutions I am responsible for the

{ 1 }

preparation and prosecution of criminal cases and supervising the duties of junior prosecutors. During my tenure as a prosecutor, I have become knowledgeable about the criminal laws and procedures of Jamaica.

[9]   In the course of my duties, I have become familiar with the charges and evidence in the case of *Regina v Ayele Logan Russell*.  This prosecution arose from an investigation by the Detective Constable Garfield Kerr of the Jamaica Constabulary Force which revealed that Ayele Logan Russell committed the offence of Murder contrary to common law.

## PROCEDURAL HISTORY OF THE CASE

[10]   All criminal proceedings in Jamaica are initiated in the Parish Court, whether or not they are felonies or misdemeanours.

[11]   That Murder is an indictable matter which is beyond the jurisdiction of the Parish Court. Meaning that it is tried in the Supreme Court of Judicature. Indictable matters are initiated in the Parish Court with the laying of a complaint or information which is signed by either a justice of the peace or the clerk of court. Sections 29-33 of the **Justices of the Peace Jurisdiction Act** speaks to the manner of complaint or information in indictable matters. Please find attached hereto a copy of said sections marked **Exhibit JCT-1.**

[12]   The Parish Judge commits the person for trial in the Supreme Court of Judicature in an indictable matter which is beyond his jurisdiction by holding a Committal Proceeding to determine whether or not the evidence is sufficient.

[13]   In indictable trials in the Supreme Court of Judicature, which take place before a Judge and a Jury, the indictment is the document filed in Court. Thus after the Committal Proceedings if the Director of Public Prosecutions wishes to proceed with the indictable charge, an indictment is caused to be filed in the Supreme Court. It is this indictment which will initiate proceedings in the Supreme Court of Judicature.

[13]   That in the instant request, investigations were carried out by Detective Constable Garfield Kerr of the Negril Criminal Investigation Branch.

[14]   That on the 9th day of June, 2017, a warrant on information for the arrest of Ayele Logan Russell along with the information being the complaint of Detective Constable Garfield Kerr was issued by Hubert Williams Commission number N00068, a Justice of the Peace for the parish of Westmoreland for the offence of Murder contrary to common law. Please find attached hereto a copy of the said Warrant on Information, along with the information, certified as true and accurate marked **Exhibit JCT-2.**

{ 2 }

## THE CHARGES AND PERTINENT JAMAICAN LAW

[18]   The Information charges that Ayele Logan Russell committed the following offence:-

*Murder*

"Between the 23rd day of April, 2017 and the 27th day of April, 2017 in the parish of Westmoreland murdered N███ D███ S███ D███ contrary to common law."

[19]   Murder is an offence for which Jamaica may extradite under its laws.

[20]   Jamaica requests the extradition of Ayele Logan Russell for the offence of Non-Capital Murder which is contrary to Common Law. The offence is punishable under Jamaican law by more than one (1) year of imprisonment. The offence of Non- Capital Murder is punishable by a term of imprisonment for life with a mandatory minimum sentence of fifteen years. Please find attached hereto a copy of sections 3A(1) and 3A(2) of the **Offences Against the Person Act marked Exhibit JCT-3.**

**Offence:**

[21]   Under Jamaican law, murder is committed where a person by a deliberate or voluntary act intentionally kills another.

[22]   The offence of murder is triable only in the Supreme Court of Judicature before a Judge and a Jury.

[23]   To satisfy its burden of proof and convict Ayele Logan Russell for the offence of Murder, the prosecution must establish at trial each of the following essential elements beyond a reasonable doubt :-

[a]   The death of the deceased named in the indictment.

[b]   That it was the Defendant/Accused who killed her.

[c]   That the Defendant/Accused did so by a voluntary or deliberate act, i.e. that it was not by accident, no lawful excuse, no provocation or self defence.

[d]   That he intended either to kill the deceased or inflict serious bodily injury on her.

[24]   The case against Ayele Logan Russell is based on circumstantial evidence.

[25]   That under Jamaican law a circumstantial case is one which depends for its cogency on the unlikelihood of coincidence. The prosecution seeks to prove separate events and circumstances which can be explained rationally only by the guilt of the accused.



{ 3 }

Those circumstances can include opportunity, proximity to the critical events, communications between participants, scientific evidence, and motive.

[26]   At the conclusion of the prosecution case the question for the judge is whether, looked at critically and in the round, the jury could safely convict. The question for the jury is whether the facts as they find them to be drive them to the conclusion, so that they are sure, that the accused is guilty.

## SUMMARY OF ALLEGATIONS

[27]   The allegations are as follows:

"On Monday June 5, 2017, at about 6:00 p.m. Detective Constable Garfield Kerr was on duty at the Negril Police Station in the parish of Westmoreland. Whilst on duty one Carlene Bailey was introduced to him. Carlene Bailey made a report to him that her daughter N███ D███ S███ D███ (hereafter N███ D███) and granddaughter O███ M███ have been missing and that they were both killed by a man named Ayele Russell with whom N███ was in a romantic relationship.

The last time Carlene Bailey said that she had any contact with N███ D███ was on Sunday the 23rd day of April, 2017 over FACEBOOK MESSENGER where she (N███) told Carlene Bailey that she was going to a hotel in Negril to spend her birthday which was on April 29.

Carlene Bailey also said that N███ D███ also had a tattoo across her left breast with the word "Orlando" across it.

Carlene Bailey also informed Detective Constable Garfield Kerr that Ayele Russell resided at Pee Wee Lane, West End in Negril, with his mother Marvella Johnson who owns the house.

Contact was made with Marvella Johnson who came to the Negril Police Station who on response to Detective Constable Garfield Kerr's queries answered that Ayele was not in Jamaica but overseas. She also gave her assent for Detective Constable Garfield Kerr to have access to Ayele's room.

Detective Constable Garfield Kerr, Cons. E Reid and Marvella Johnson returned to her house at Pee Wee Lane, West End in Negril. They went to Ayele's room which was located to the rear of the house. The door was secured with padlocks and a long chain with weights attached. Marvella Johnson was the one who used a hammer to hit off the padlocks thus gaining access to the room.

Upon entrance to the room Detective Constable Garfield Kerr made the following observations:-

{ 4 }

[a]     a foul odour

[b]     two (2) construction buckets on the floor of the bedroom

[c]     a section of the floor of the bedroom with concrete mixture on it.

[d]     a Western Union receipt bearing the name Ayele Russell was found in one of the buckets.

[e]     a black brassiere

[f]     what appeared to be blood on a compact disc

[g]     an iron bar lying across the sofa to the right side of the room.

[h]     a machete lying across the dresser

[i]     a mattress leaning against the wall to the left side of the room

[j]     behind the mattress a rectangular shaped concrete structure two (2) feet in height and six (6) feet in length upon which items of clothing were piled.

Marvella Johnson denied having any knowledge of the Concrete structure saying that it was not in the room before and that it must have been Ayele who built it.

Detective Constable Garfield Kerr then cordoned off the room and made arrangements for police officers to guard the house and the room.

At about 11:30 pm Members of the Technical Services Team arrived but the scene was not processed then on the instructions of Deputy Superintendent of Police Bernard.

Wednesday June 7, 2017 Detective Constable Garfield Kerr returned to the house along with members of the Technical Services Team and forensic analysts from the Government Forensic Laboratory.

Recovered from the room were the following items:-

[a]     one (1) blood stained female slipper.

[b]     one (1) blood stained compact disc.

[c]     one (1) blood stained Red "American Eagle" trousers.

[d]     one (1) blood stained multi-coloured baby dress.

{ 5 }

[e]     one (1) blood stained knife

[f]     one (1) blood stained pillow case

[g]     one (1) blood stained khaki shorts

[h]     one (1) blood stained multi-coloured t-shirt

[i]     two (2) blood stained cream coloured sheets

[j]     one (1) machete.

[k]     one (1) ganja cigar

[l]     one (1) one blood stained Western Union receipt

[m]     one (1) letter with a blood stain on it.

Later that same day a hole was bored into the concrete structure where an object wrapped in black plastic bags was seen within. The object was removed and the bags removed and it was found to contain wrapped in floral sheets the nude decomposing body of an adult female with tattoos one on the left breast bore the name "Orlando" and on the lower section of the abdomen the name "Shantal" and on the lower right arm that of a flower.

It was also observed on the corpse what appeared to be stab wounds on the abdomen and right arm.

On the 22nd day of June, 2017 a post mortem of the body was conducted at Archer's Funeral Home by Dr. K.S.N. Prasad MD, DFM and Consultant Forensic Pathologist who stated that no definite opinion as to the cause of death can be given because of advanced decomposition but death is attributed to the stab wound to the abdomen in view of the discolouration of the mesentery.

The body of N███ D██ was identified at the post mortem examination by her uncle Kevon Bailey who is the brother of Carlene Bailey mother of the deceased. He was also able to identify her because of the tattoo on her chest."

On the statement of Marvella Johnson the mother of Ayele Russell, she states that only Ayele has access to that room and he is in sole possession of the key. She also states that the deceased N███ D██r and her daughter O████ moved into the room sometime in 2016.

On the statement of Marvella Johnson she recounts that on Easter Sunday, the 16th day of April, 2017, she witnessed Ayele Logan Russell and N███ D██ fighting.

EXT_RUSSELL_00022

She intervened telling Ayele to behave himself and to release N███ and not to get himself into trouble. Ayele who was upset told his mother:-

> *"You see you woman, every time you see me and me women into things you get into my business."*

Ayele then used his fingers and made the sign of a gun and said to his mother:-

> *"I am going to burst a shot into your head. I have something for you. I have something for you"*

On Monday the 17th day of April, 2017 Marvella Johnson heard the voices of both Ayele and N███ talking in their room.

On Tuesday the 18th day of April, 2017 in the morning, Marvella Johnson left home to visit family and other relatives. On her return home at 4:00 pm she smelt the strong odour of disinfectant emanating from Ayele's room. She did not see or hear Ayele or N███ that day.

On Wednesday April 19, 2017 she still noticed the smell of disinfectant coming from Ayele's room. She discussed the matter with a friend and telephoned a police constable. She spent the night at a friend's home rather than return home.

Marvella Johnson went back to her house with a friend on Friday April 21, 2017, but did not notice the smell of disinfectant. During the visit she did not see Ayele or N███ D██. However, she did not sleep at her house that night.

Marvella Johnson went back to her house with a friend on Saturday April 22, 2017. During the visit she did not see Ayele Russell or N███ D██. Again, she did not sleep at her house that night.

On Sunday April 23, 2017 Marvella Johnson went to her house in the company of a friend where they observed Ayele with a knapsack and he was observed placing a suitcase in the trunk of a car parked in front of the house. Ayele said that he will soon return and she did not see him again. She observed that his door and padlocked and chained. She did not see N███ D██ that day at all.

Five days later she received a text from Ayele that he was in New York and up to that point still had not seen or heard from N███ D██.

Information provided by the Passport Immigration and Citizen Agency (PICA) of Jamaica shows that Ayele Russell departed from Jamaica on the 27th day of April, 2017 from the Donald Sangster International Airport at Montego Bay for New York in the United States of America.

[28]   Attached to the summary of the allegations are the following exhibits:-

EXT_RUSSELL_00023

[i]    Photograph of house at Pee Wee Lane, West End, Negril taken by Detective Constable F. Reid marked as Exhibit "JCT- 4"

[ii]    Photograph of entrance to room of Ayele Logan Russell taken by Detective Constable F. Reid marked as Exhibit "JCT- 5"

[iii]    Photograph of door to room of Ayele Logan Russell showing padlock, and chain with weight attached taken by Detective Constable F. Reid marked as Exhibit "JCT- 6"

[iv]    Photograph of the inside to room of Ayele Logan Russell showing tomb like concrete structure and mattress adjacent taken by Detective Constable F. Reid marked as Exhibit "JCT- 7".

[v]    Close up of tomb like concrete structure inside of the room of Ayele Logan Russell taken by Detective Constable F. Reid marked as Exhibit "JCT- 8" and Exhibit "JCT-9".

[vi]    Photograph of tomb like concrete structure inside of the room of Ayele Logan Russell showing an object stored within taken by Detective Constable F. Reid marked as Exhibit "JCT- 10".

[vii]    Photograph of tomb like concrete structure inside of the room of Ayele Logan Russell showing object removed from taken by Detective Constable F. Reid marked as Exhibit "JCT- 11" and Exhibit "JCT-12".

[viii]    Photograph of object removed from tomb like structure in the room of Ayele Logan Russell which has been unwrapped showing an object wrapped in black plastic bags marked as Exhibit "JCT- 13".

[ix]    Photograph of object removed from tomb like structure in the room of Ayele Logan Russell which has been further unwrapped showing an object resembling a human body wrapped in a floral sheet marked as Exhibit "JCT- 14".

[x]    Exhibit "JCT -15" is a copy of the photograph of the Ayele Logan Russell.

## STATUTE OF LIMITATIONS

[28]    There is no statute of limitations on the institution of proceedings by the prosecution for the offence of murder in Jamaica.

## LOCATION OF FUGITIVE

[29]    On information received the fugitive Ayele Logan Russell is believed to be residing at 631 East 96th Street, Brooklyn, New York in the United States of America.



## DESCRIPTION OF FUGITIVE

[30]    That Ayele Logan Russell is of dark complexion, about 5ft 8in tall, he has a straight face and nose, black hair done in cornrows and the tattoo of a bird on his chest.

[31]    That I produce the photograph of the Ayele Logan Russell as an exhibit marked Exhibit "JCT- 15".

[32]    That Ayele Logan Russell was positively identified by the said photograph attached as Exhibit "JCT- 15" by Jamaica Constabulary Force witness, Constable E. Reid.

## CONCLUSION

[33]    I have attached to this Affidavit the following documents that establish proof of Ayele Logan Russell's criminal activity in violation of the laws of Jamaica as alleged in the warrant on information.

[i]    Exhibit "JCT-1" is a copy of sections 29-33 of the Justices of the Peace (Jurisdiction) Act .

[ii]    Exhibit "JCT -2" is a copy of the Warrant on Information and Information issued on the 9th day of June, 2017 naming Ayele Logan Russell as a defendant.

[iii]    Exhibit "JCT-3" is a copy of sections 2(1), 2(2), 3A(1) and (2) of the Offences Against the Person Act.

[iv]    Exhibit "JCT- 4" photograph of house at Pee Wee Lane, West End, Negril. Photograph taken by Detective Constable F. Reid.

[v]    Exhibit "JCT- 5" photograph of entrance to room of Ayele Logan Russell. photograph taken by Detective Constable F. Reid.

[vi]    Exhibit "JCT- 6" photograph of door to room of Ayele Logan Russell showing padlock, and chain with weight attached photograph taken by Detective Constable F. Reid.

[vii]    Exhibit "JCT- 7" photograph of the inside to room of Ayele Logan Russell showing tomb like concrete structure and mattress adjacent photograph taken by Detective Constable F. Reid.

[viii]    Exhibit "JCT- 8" and Exhibit "JCT-9" photographs showing close up of tomb like concrete structure inside of the room of Ayele Logan Russell taken by Detective Constable F. Reid marked as

[ix]    Exhibit "JCT- 10".photograph of tomb like concrete structure inside of the room of Ayele Logan Russell showing an object stored within. Photograph taken by Detective Constable F. Reid marked as

[vii]   Photograph of tomb like concrete structure inside of the room of Ayele Logan Russell showing object removed from thereof. Photograph taken by Detective Constable F. Reid marked as **Exhibit "JCT- 11"** and **Exhibit "JCT-12"**.

[viii]   Photograph of object removed from tomb like structure in the room of Ayele Logan Russell which has been unwrapped showing an object wrapped in black plastic bags. Photograph taken by Detective Constable F. Reid marked as **Exhibit "JCT- 13"**.

[ix]   Photograph of object removed from tomb like structure in the room of Ayele Logan Russell which has been further unwrapped showing an object resembling a human body wrapped in a floral sheet. Photograph taken by Detective Constable F. Reid marked as **Exhibit "JCT- 14"**.

[x]   **Exhibit "JCT -15"** is a copy of the photograph of the Ayele Logan Russell.

[33]   I have thoroughly reviewed the statements of Carlene Bailey, Detective Constable Garfield Kerr, Marvella Johnson, Kevon Bailey, Constable E. Reid and Detective Constable F. Reid  and the post mortem report of Dr. KSN Prasad MD, DFM Consultant Forensic Pathologist and attest that this evidence indicates that Ayele Logan Russell is guilty of the offence charged in the Warrant on Information.

**SWORN TO** by the said                              )
**JEREMY C. TAYLOR** at                              )
Half way Tree Parish Court, Half Way Tree           )
In The parish of St. Andrew.                         )

......................................................

On the   28th   day of  November                     )        **JEREMY C. TAYLOR**
2017 before me:

**CLERK OF THE COURT FOR THE PARISHES OF KINGSTON AND ST. ANDREW**

EXT_RUSSELL_00026



**AFFIDAVIT OF JEREMY C. TAYLOR**
**IN SUPPORT OF THE REQUEST FOR**
<u>**THE EXTRADITION OF AYELE LOGAN RUSSELL**</u>

IN THE MATTER OF THE
EXTRADITION ACT 1991

AND

IN THE MATTER OF THE
EXTRADITION TREATY BETWEEN
THE GOVERNMENTS OF JAMAICA
AND THE UNITED STATES OF
AMERICA

**EXHIBIT JT 1**

..............................................
JEREMY C. TAYLOR

.....................................
CLERK OF THE COURT
FOR KINGSTON & ST. ANDREW

26                    *JUSTICES OF THE PEACE JURISDICTION*

more Justices, such Justices must be present and acting together during the whole of the hearing and determination of the case.

Forms in
First
Schedule
relating to
proceedings
under
Part I.
31/1995
S. 3.

**28.** The several forms in the First Schedule relating to proceedings under this Part or forms to the like effect shall be deemed good and valid and sufficient in law; and it shall not be necessary to the validity thereof that the same shall be, or purport to be, made under seal.

PART II.  *Preliminary Examinations*
*Indictable Offences*

When
Justice
may cause
party to be
brought
before him.
First
Schedule
Form (15).
31/1995
S. 3.

**29.** In all cases where a charge or complaint (according to Form (15) in the First Schedule), shall be made before any one or more of Her Majesty's Justices of the Peace for any parish within this Island that any person has committed, or is suspected to have committed, any treason, felony, or indictable misdemeanour or other indictable offence whatsoever within the limits of the jurisdiction of such Justice or Justices or that any person guilty or suspected to be guilty, of having committed any such crime or offence elsewhere out of the jurisdiction of such Justice or Justices, is residing or being, or is suspected to reside or be, within the limits of the jurisdiction of such Justice or Justices, then and in every such case, if the person so charged or complained against shall not then be in custody, it shall be lawful for such Justice or Justices to issue his or their

First
Schedule
Form (16).
31/1995
S. 3.

warrant (according to Form (16) in the First Schedule), to apprehend such person, and to cause him to be brought before such Justice or Justices or any other Justice or Justices for the same parish, to answer to such charge or complaint, and to be further dealt with according to law:

Provided always, that in all cases it shall be lawful for such Justice or Justices to whom such charge or complaint shall be preferred, if he or they shall so think fit, instead

EXT_RUSSELL_00028

of issuing in the first instance his or their warrant to apprehend the person so charged or complained against to issue his or their summons (according to Form (17) in the First Schedule), directed to such person, requiring him to appear before the said Justice or Justices at a time and place to be therein mentioned, or before such other Justice or Justices of the said parish as may then be there; and if, after being served with such summons in manner hereinafter mentioned, he shall fail to appear at such time and place in obedience to such summons, then and in every such case the said Justice or Justices, or any other Justice or Justices for the said parish, may issue his or their warrant (according to Form (18) in the First Schedule), to apprehend such person so charged or complained against and cause such person to be brought before him or them, or before some other Justice or Justices for the said parish, to answer to the said charge or complaint, and to be further dealt with according to law:

First
Schedule
Form (17).
31/1995
S. 3.

First
Schedule
Form (18).
31/1995
S. 3.

Provided, nevertheless, that nothing herein contained shall prevent any Justice or Justices from issuing the warrant hereinbefore first-mentioned at any time before or after the time mentioned in such summons for the appearance of the said accused party.

**30.** It shall be lawful for any Justice or Justices to grant or issue any warrant as aforesaid, or any search warrant, on a Sunday as well as on any other day.

Power to
Justice to
issue
warrants
on a Sunday

**31.** In all cases where a charge or complaint for any indictable offence shall be made before such Justice or Justices as aforesaid, if it be intended to issue a warrant in the first instance against the party or parties so charged, a written information and complaint thereof (according to Form (15) in the First Schedule), on the oath or affirmation of the informant, or of some witnesses in that behalf, shall be laid before such Justice or Justices:

When
information
in writing
necessary.

First
Schedule
Form (15).
31/1995
S. 3.

[The inclusion of this page is authorized by L.N. 95/1997]

Provided always, that in all cases where it is intended to issue a summons instead of a warrant in the first instance, it shall not be necessary that such information and complaint shall be in writing, or be sworn to or affirmed in manner aforesaid, but in every such case such information and complaint may be by parole merely, and without any oath or affirmation whatsoever to support or substantiate the same:

Provided also, that no objection shall be taken or allowed to any such information or complaint for any alleged defect therein in substance, or in form, or for any variance between it and the evidence adduced on the part of the prosecution before the Justice or Justices who shall take the examination of the witnesses in that behalf as hereinafter mentioned.

**Procedure to compel attendance of person charged.**

**32.** Upon such information and complaint being so laid as aforesaid, the Justice or Justices receiving the same may, if he or they shall think fit, issue his or their summons or warrant respectively as, hereinbefore is directed, to cause the person charged as aforesaid to be and appear before him or them, or any other Justice or Justices for the said parish, to be dealt with according to law; and

**First Schedule Form (17). 31/1995 S. 3.**

every such summons (according to Form (17) in the First Schedule) shall be directed to the party so charged in and by such information, and shall state shortly the matter of such information, and shall require the party to whom it is so directed to be and appear at a certain time and place therein mentioned before the Justice who shall issue such summons, or before such other Justice or Justices of the said parish as may then be there, to answer to the said charge, and to be further dealt with according to law; and every such summons shall be served by a constable or other peace officer upon the person to whom it is so directed, by delivering the same to the party personally, or, if he cannot con-

[The inclusion of this page is authorized by L.N. 95/1997]

EXT_RUSSELL_00030

veniently be met with, then by leaving the same with some person for him at his last or most usual place of abode; and the constable or other peace officer who shall have served the same in manner aforesaid shall attend at the time and place, and before the Justices in the said summons mentioned, to depose, if necessary, to the service of such summons; and if the person so served shall not be and appear before the Justice or Justices at the time and place mentioned in such summons in obedience to the same, then it shall be lawful for such Justice or Justices to issue his or their warrant (according to Form (18) in the First Schedule), for apprehending the party so summoned, and bringing him before such Justice or Justices, or some other Justice or Justices for the said parish, to answer the charge in the said information and complaint mentioned, and to be further dealt with according to law: <span style="float:right">First Schedule Form (18). 31/1995 S. 3.</span>

Provided always, that no objection shall be taken or allowed to any such summons or warrant for any alleged defect therein in substance or in form, or for any variance between it and the evidence adduced on the part of the prosecution before the Justice or Justices who shall take the examination of the witnesses in that behalf as hereinafter mentioned; but if any such variance shall appear to such Justice or Justices to be such that the party charged has been thereby deceived or misled, it shall be lawful for such Justice or Justices at the request of the party so charged, to adjourn the hearing of the case to some future day, and in the meantime to remand the party so charged, or admit him to bail in manner hereinafter mentioned.

**33.** Every warrant (according to Form (18) in the First Schedule) hereafter to be issued by any Justice or Justices to apprehend any person charged with any indictable offence shall be under the hand or hands of the Justice or Justices issuing the same, and may be directed either to any <span style="float:right">Warrant to apprehend. First Schedule Form (18). 31/1995 S. 3.</span>

EXT_RUSSELL_00031

constable or other person by name, or generally to the constable of the parish within which the same is to be executed, without naming him; or to such constable, and all other constables or peace officers in the parish within which the Justice or Justices issuing such warrant has or have jurisdiction; or generally to all the constables or peace officers within such last-mentioned parish; and it shall state shortly the offence on which it is founded, and shall name or otherwise describe the offender, and it shall order the person or persons to whom it is directed to apprehend the offender, and bring him before the Justice or Justices issuing the said warrant, or before some other Justice or Justices for the said parish, to answer to the charge contained in the said information, and to be further dealt with according to law; and it shall not be necessary to make such warrant returnable at any particular time, but the same may remain in force until it shall be executed:

**Defects in substance or form of warrant.**    Provided always, that no objection shall be taken or allowed to any such warrant for any defect therein in substance or in form, or for any variance between it and the evidence adduced on the part of the prosecution before the Justice or Justices who shall take the examinations of the witnesses in that behalf as hereinafter mentioned; but if any such variance shall appear to such Justice or Justices to be such that the party charged has been thereby deceived or misled, it shall be lawful for such Justice or Justices, at the request of the party so charged, to adjourn the hearing of the case to some future day, and in the meantime to remand the party so charged, or to admit him to bail in manner hereinafter mentioned.

**Examination.**    34. In all cases where any person shall appear or be brought before any Justice or Justices charged with any indictable offence committed within this Island, or whether such person appear voluntarily upon summons, or have been apprehended with or without warrant, or be in cus-

[The inclusion of this page is authorized by L.N. 95/1997]



**AFFIDAVIT OF JEREMY C. TAYLOR**
**IN SUPPORT OF THE REQUEST FOR**
**THE EXTRADITION OF AYELE LOGAN RUSSELL**

**IN THE MATTER OF THE**
**EXTRADITION ACT 1991**

**AND**

**IN THE MATTER OF THE**
**EXTRADITION TREATY BETWEEN**
**THE GOVERNMENTS OF JAMAICA**
**AND THE UNITED STATES OF**
**AMERICA**

**EXHIBIT JT 2**

.............................................
JEREMY C. TAYLOR

.............................................
CLERK OF THE COURT
FOR KINGSTON & ST. ANDREW

2

1

**INFORMATION**

Parish of Westmoreland

The Information and Complaint of Garfield Kerr, Detective Constable

of the parish of Westmoreland made and taken upon oath

before the undersigned this 9th day of June in the year of Our Lord

Two thousand and Seventeen who saith that ~~on~~ between

the 23rd and 27th day of April in the year 2017

aforesaid one Ayele Logan Russell of West End, Negril of the said parish

of Westmoreland with force Committed at

Pee Wee Lane, West End and within the jurisdiction of this Court

Negril, Westmoreland

Did Murder ███████ █████ ███ ██

Contrary to Common Law.

against the form of the Statute in such case made and provided, and against the Peace of Our Sovereign Lady the

Queen Her Crown and Dignity, and thereupon the said Complainant prays that the said Ayele Logan

Russell defendant may be summoned to answer unto the said Complaint according to Law.

Taken and sworn to before me at San Leor

In the parish of Westmorland this 9th

June Two thousand and Seventeen day of

.......................................................
Justice of the Peace or Clerk of Courts
for the Parish of West

I hereby certify that this is a true copy of sworn
Information (1) bearing the name Ayele Logan Russell Wee Lane
West End, Negril Westmoreland for Murder.

JAMAICA CONSTABULARY FORCE

JUN 28 2017

WESTMORELAND HEADQUARTERS

EXT_RUSSELL_00034

Petty Session -- (Form G)            5                    Warrant on Information

JAMAICA SS.                                    )

    Parish of *Westmoreland* )

To the Constables of *Jamaica Constabulary Force*

Officers of the Parish of *Westmoreland* )

    WHEREAS Information hath this day been laid before the undersigned one of Her Majesty's Justice of the Peace in and for the said parish of

for that *Ayele Logay, Russell of Pe Wee Lane, West End, Negril* of the said parish, to wit, ~~on the~~ *between* 23rd and 27th day of *April 2017* in the year of Our Lord

at the said parish and within my jurisdiction

*Did Murder* █████ █████ █████ █████

    *Contrary to Common Law*

and oath being now made before me, substantiating the matter of such Information.

    THESE are therefore to command you in Her Majesty's name, forthwith to apprehend the said *Ayele Logay Russell* and to bring him/~~her~~ before some one or more of Her Majesty's Justices of the Peace in and for the said parish to answer to the Information, and be further dealt with according to Law.

    Given under my hand this *6th* day of *June - 2017* in the parish of *W'land* in the year of Our Lord

        aforesaid

                *[signature]*

...........................................

      Justice of the Peace - Westmoreland

*I hereby certify that this is a true copy of Warrant on Information bearing the name Ayele Logan Russell of Pee Wee Lane, West End, Negril, Westmoreland for Murder.*

*[signature] Sgt #0775*

*2017/06/28*

JAMAICA CONSTABULARY FORCE

JUN 28 2017

WESTMORELAND HEADQUARTERS

EXT_RUSSELL_00035



AFFIDAVIT OF JEREMY C. TAYLOR
IN SUPPORT OF THE REQUEST FOR
THE EXTRADITION OF AYELE LOGAN RUSSELL

IN THE MATTER OF THE
EXTRADITION ACT 1991

AND

IN THE MATTER OF THE
EXTRADITION TREATY BETWEEN
THE GOVERNMENTS OF JAMAICA
AND THE UNITED STATES OF
AMERICA

**EXHIBIT JT 3**

......................................
JEREMY C. TAYLOR

......................................
CLERK OF THE COURT
FOR KINGSTON & ST. ANDREW

| | Cap. 268. | Sch., |
|---|---|---|
| | Laws | 34 of 1973, |
| THE OFFENCES AGAINST THE | 43 of 1958, | 1 of 1979 |
| PERSON ACT | 15 of 1962 | 1st Sch., |
| | S. 35, | 30 of 1988, |
| | Sch. | 14 of 1992, |
| | Acts | 31 of 1995 |
| | 42 of 1963 | S. 4, |
| [1864.] | S. 2. | 1 of 2005, |
| | 33 of 1967, | 3 of 2006, |
| | 44 of 1968, | 12 of 2009 |
| | 42 of 1969 | S. 42, |
| | 3rd Sch., | 18 of 2010. |
| | 9 of 1972 | |

**1.** This Act may be cited as the Offences against the Person Act.    *Short title.*

### *Homicide*

**2.**—(1) Subject to subsection (3), every person to whom section 3(1A) applies or who is convicted of murder committed in any of the following circumstances shall be sentenced in accordance with section 3(1)(*a*), that is to say—    *Murder.*
*14/1992*
*S. 2.*
*1/2005*
*S. 2(a)(b).*

    (*a*) any murder—    *3/2006*
*S. 2(a).*

        (i) committed by a person if, in the course or furtherance of, arising out of, or ancillary to, that murder, the person commits an offence referred to in subsection (1A); or

        (ii) committed by a person in the course or furtherance of, arising out of, or ancillary to, an offence referred to in subsection (1A),

whether or not the individual murdered was an individual that the offender intended to murder in committing the offence;

    (*b*) the murder of—

        (i) a member of the security forces acting in the execution of his duties or of a person assisting a member so acting;

EXT_RUSSELL_00037

6                    *OFFENCES AGAINST THE PERSON*

    (ii) a correctional officer acting in the execution of his duties or of a person assisting a correctional officer so acting;

    (iii) a judicial officer acting in the execution of his duties; or

    (iv) any person acting in the execution of his duties, being a person who, for the purpose of carrying out those duties, is vested under the provisions of any law in force for the time being with the same powers, authorities and privileges as are given by law to members of the Jamaica Constabulary Force,

or the murder of any such member of the security forces, correctional officer, judicial officer or person for any reason directly attributable to the nature of his occupation;

(*c*) the murder of any person for any reason directly attributable to—

    (i) the status of that person as a witness or party in a pending or concluded civil cause or matter or in any criminal proceedings; or

    (ii) the service or past service of that person as a juror in any criminal trial;

(*d*) the murder of a Justice of the Peace acting in the execution of his judicial functions;

(*e*) any murder committed pursuant to an arrangement whereby money or anything of value—

    (i) passes or is intended to pass from one person to another or to a third party at the request or direction of that other person; or

    (ii) is promised by one person to another or to a third person at the request or direction of that other person,

EXT_RUSSELL_00038

*OFFENCES AGAINST THE PERSON*                                              8.03

(a)  if any member of the trial jury, after the conviction, dies or is discharged by the court as being through illness incapable of continuing to act or for any other cause, the inquiry as to whether or not the woman is pregnant shall proceed without him; and

(b)  where there is no trial jury, or where a jury have disagreed as to whether the woman is or is not pregnant, or have been discharged by the court without giving a verdict on that question, the jury shall be constituted as if to try whether or not she was fit to plead, and shall be sworn in such manner as the court may direct.

(5)  The question whether the woman is pregnant or not shall be determined by the jury on such evidence as may be laid before them either on the part of the woman or on the part of the Crown, and the jury shall find that the woman is not pregnant unless it is proved affirmatively to their satisfaction that she is pregnant.

(6)  Where on proceedings under this section the jury find that the woman in question is not pregnant the woman may appeal under the Judicature (Appellate Jurisdiction) Act, to the Court of Appeal and that Court, if satisfied that for any reason the finding should be set aside, shall quash the sentence passed on her and instead thereof pass on her any sentence of imprisonment that may be imposed under subsection (1)(b): <span>15/1962 S. 35.</span> <span>42/1969 3rd Sch. 1/2005 S. 3(f).</span>

Provided that the operation of the provisions of this subsection shall be deemed to be coincident with the operation of the Judicature (Appellate Jurisdiction) Act.

**3A.**—(1) On an indictment charging a person with murder falling within section 2(1), he may be found not guilty of such murder but guilty of murder falling within section 2(2). <span>Procedure regarding murder charge. 1/2005 S. 4.</span>

(2) For the purpose of any appeal against conviction, murder falling within section 2(1) shall be treated as a distinct offence from murder falling within section 2(2).

(3) Where on an appeal against a conviction of murder—

---

(*a*)   falling within section 2(1)(*a*) to (*f*); and

(*b*)   for which the appellant has been sentenced to death, the Court substitutes a verdict of guilty of murder falling within section 2(2), the Court shall nevertheless determine whether a sentence of death is the appropriate sentence by virtue of section 3(1A) and shall confirm that sentence if it is so found to be appropriate.

(4) Subject to the foregoing provisions of this section, murder falling within section 2(1) shall not be treated, for any purpose, as a different offence from murder falling within section 2(2).

**3B.** [*Repealed by Act 1 of 2005.*]

Provisions as to appeals in relation to repeated and multiple murders. 14/1992 S. 4.

**3C.**—(1) Where a person is sentenced to death by virtue of subsection (1A) of section 3, he shall have the like right of appeal against the sentence as if the appeal were against a conviction involving sentence of death.

(2)  On any such appeal against sentence, the Court shall have the same powers as to allowing or dismissing the appeal as on an appeal against a conviction; and where the Court allows the appeal, and it appears to the Court that, having regard to the decision on the appeal, the sentence is not warranted in law, the Court shall quash the sentence and pass the appropriate sentence in substitution for it.

(3) Where a person is sentenced to death under subsection (1A) of section 3 (which relates to more than one conviction for murder) and afterwards one of the convictions is set aside on appeal—

(*a*)  that person may apply to the Court of Appeal to set aside the sentence of death on the ground that it is no longer warranted in law having regard to the decision on appeal; and

(*b*)  whether or not an application is made under paragraph (*a*), the Registrar of the Court of Appeal shall notify the Court that the sentence is one which should be set aside on the ground referred to in that paragraph,

EXT_RUSSELL_00040



**AFFIDAVIT OF JEREMY C. TAYLOR**
**IN SUPPORT OF THE REQUEST FOR**
**THE EXTRADITION OF AYELE LOGAN RUSSELL**

**IN THE MATTER OF THE**
**EXTRADITION ACT 1991**

**AND**

**IN THE MATTER OF THE**
**EXTRADITION TREATY BETWEEN**
**THE GOVERNMENTS OF JAMAICA**
**AND THE UNITED STATES OF**
**AMERICA**

**EXHIBIT JT 4**

........................................................
JEREMY C. TAYLOR

........................................................
CLERK OF THE COURT
FOR KINGSTON & ST. ANDREW

EXT_RUSSELL_00042



**AFFIDAVIT OF JEREMY C. TAYLOR**
**IN SUPPORT OF THE REQUEST FOR**
**THE EXTRADITION OF AYELE LOGAN RUSSELL**

IN THE MATTER OF THE
EXTRADITION ACT 1991

AND

IN THE MATTER OF THE
EXTRADITION TREATY BETWEEN
THE GOVERNMENTS OF JAMAICA
AND THE UNITED STATES OF
AMERICA

**EXHIBIT JT 5**

.............................................
JEREMY C. TAYLOR

.............................................
CLERK OF THE COURT
FOR KINGSTON & ST. ANDREW



EXT_RUSSELL_00044



**AFFIDAVIT OF JEREMY C. TAYLOR**
**IN SUPPORT OF THE REQUEST FOR**
**THE EXTRADITION OF AYELE LOGAN RUSSELL**

IN THE MATTER OF THE
EXTRADITION ACT 1991

AND

IN THE MATTER OF THE
EXTRADITION TREATY BETWEEN
THE GOVERNMENTS OF JAMAICA
AND THE UNITED STATES OF
AMERICA

**EXHIBIT JT 6**

............................................
JEREMY C. TAYLOR

............................................
CLERK OF THE COURT
FOR KINGSTON & ST. ANDREW



EXT_RUSSELL_00046



**AFFIDAVIT OF JEREMY C. TAYLOR**
**IN SUPPORT OF THE REQUEST FOR**
<u>**THE EXTRADITION OF AYELE LOGAN RUSSELL**</u>

IN THE MATTER OF THE
EXTRADITION ACT 1991

AND

IN THE MATTER OF THE
EXTRADITION TREATY BETWEEN
THE GOVERNMENTS OF JAMAICA
AND THE UNITED STATES OF
AMERICA

**EXHIBIT JT 7**

.........................................
JEREMY C. TAYLOR

.........................................
CLERK OF THE COURT
FOR KINGSTON & ST. ANDREW



EXT_RUSSELL_00048



**AFFIDAVIT OF JEREMY C. TAYLOR**
**IN SUPPORT OF THE REQUEST FOR**
**THE EXTRADITION OF AYELE LOGAN RUSSELL**

IN THE MATTER OF THE
EXTRADITION ACT 1991

AND

IN THE MATTER OF THE
EXTRADITION TREATY BETWEEN
THE GOVERNMENTS OF JAMAICA
AND THE UNITED STATES OF
AMERICA

**EXHIBIT JT 8**

......................................
JEREMY C. TAYLOR

......................................
CLERK OF THE COURT
FOR KINGSTON & ST. ANDREW



AFFIDAVIT OF JEREMY C. TAYLOR
IN SUPPORT OF THE REQUEST FOR
THE EXTRADITION OF AYELE LOGAN RUSSELL

IN THE MATTER OF THE
EXTRADITION ACT 1991

AND

IN THE MATTER OF THE
EXTRADITION TREATY BETWEEN
THE GOVERNMENTS OF JAMAICA
AND THE UNITED STATES OF
AMERICA

**EXHIBIT JT 9**

......................................................
JEREMY C. TAYLOR

......................................................
CLERK OF THE COURT
FOR KINGSTON & ST. ANDREW





**AFFIDAVIT OF JEREMY C. TAYLOR**
**IN SUPPORT OF THE REQUEST FOR**
**THE EXTRADITION OF AYELE LOGAN RUSSELL**

IN THE MATTER OF THE
EXTRADITION ACT 1991

AND

IN THE MATTER OF THE
EXTRADITION TREATY BETWEEN
THE GOVERNMENTS OF JAMAICA
AND THE UNITED STATES OF
AMERICA

**EXHIBIT JT 10**

.................................................
JEREMY C. TAYLOR

.................................................
CLERK OF THE COURT
FOR KINGSTON & ST. ANDREW



EXT_RUSSELL_00054



**AFFIDAVIT OF JEREMY C. TAYLOR**
**IN SUPPORT OF THE REQUEST FOR**
**THE EXTRADITION OF AYELE LOGAN RUSSELL**

IN THE MATTER OF THE
EXTRADITION ACT 1991

AND

IN THE MATTER OF THE
EXTRADITION TREATY BETWEEN
THE GOVERNMENTS OF JAMAICA
AND THE UNITED STATES OF
AMERICA

**EXHIBIT JT 11**

........................................
JEREMY C. TAYLOR

........................................
CLERK OF THE COURT
FOR KINGSTON & ST. ANDREW

EXT_RUSSELL_00056



AFFIDAVIT OF JEREMY C. TAYLOR
IN SUPPORT OF THE REQUEST FOR
<u>THE EXTRADITION OF AYELE LOGAN RUSSELL</u>

IN THE MATTER OF THE
EXTRADITION ACT 1991

AND

IN THE MATTER OF THE
EXTRADITION TREATY BETWEEN
THE GOVERNMENTS OF JAMAICA
AND THE UNITED STATES OF
AMERICA

**EXHIBIT JT 12**

...................................................
JEREMY C. TAYLOR

...................................................
CLERK OF THE COURT
FOR KINGSTON & ST. ANDREW

EXT_RUSSELL_00058



AFFIDAVIT OF JEREMY C. TAYLOR
IN SUPPORT OF THE REQUEST FOR
<u>THE EXTRADITION OF AYELE LOGAN RUSSELL</u>

IN THE MATTER OF THE
EXTRADITION ACT 1991

AND

IN THE MATTER OF THE
EXTRADITION TREATY BETWEEN
THE GOVERNMENTS OF JAMAICA
AND THE UNITED STATES OF
AMERICA

**EXHIBIT JT 13**

..............................................
JEREMY C. TAYLOR

..............................................
CLERK OF THE COURT
FOR KINGSTON & ST. ANDREW



EXT_RUSSELL_00060



**AFFIDAVIT OF JEREMY C. TAYLOR**
**IN SUPPORT OF THE REQUEST FOR**
<u>**THE EXTRADITION OF AYELE LOGAN RUSSELL**</u>

IN THE MATTER OF THE
EXTRADITION ACT 1991

AND

IN THE MATTER OF THE
EXTRADITION TREATY BETWEEN
THE GOVERNMENTS OF JAMAICA
AND THE UNITED STATES OF
AMERICA

## EXHIBIT JT 14

........................................
JEREMY C. TAYLOR

........................................
CLERK OF THE COURT
FOR KINGSTON & ST. ANDREW

EXT_RUSSELL_00062



EXT_RUSSELL_00063



**AFFIDAVIT OF JEREMY C. TAYLOR
IN SUPPORT OF THE REQUEST FOR
THE EXTRADITION OF AYELE LOGAN RUSSELL**

IN THE MATTER OF THE
EXTRADITION ACT 1991

AND

IN THE MATTER OF THE
EXTRADITION TREATY BETWEEN
THE GOVERNMENTS OF JAMAICA
AND THE UNITED STATES OF
AMERICA

**EXHIBIT JT 14**

.........................................
JEREMY C. TAYLOR

.........................................
CLERK OF THE COURT
FOR KINGSTON & ST. ANDREW

EXT_RUSSELL_00064